*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LEE ANDREW PARKER, JR.,

Defendant-Appellant.

UNPUBLISHED
December 18, 2024
1:02 PM

No. 358231
St. Joseph Circuit Court
LC No. 20-023300-FC

Before: N. P. HOOD, P.J., and CAMERON and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of assault with intent to commit murder (AWIM), MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to consecutive prison terms of 17 ½ to 60 years for AWIM and two years for felony-firearm. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

On the evening of April 8, 2020, the 17-year-old victim was at Logan Biggs's house. The victim told Biggs she believed she was pregnant with defendant's baby,[1] so she called defendant to discuss the situation. The then 20-year-old defendant suggested the two meet in Scidmore Park in Three Rivers. Although Biggs advised the victim against this, she left between 11:30 p.m. and midnight to meet defendant.

At trial, the victim testified that she met defendant at the park and the two discussed her possible pregnancy. According to the victim, defendant became increasingly agitated as the conversation progressed. While talking with the victim, defendant donned gloves. Eventually, the victim left to return to Biggs's home as defendant followed her. When the victim neared a

---

[1] The victim subsequently determined that she was not pregnant.

-1-

carport, defendant shot her in the head as she was on her knees. The victim heard two shots, did not lose consciousness, and waited on the ground until defendant left before calling for help.

At 1:26 a.m. that same morning, Kyle Murk, a telecommunicator for St. Joseph County 911 dispatch, received a 911 call from Dakarie Morris, who stated he heard a woman scream, "no," followed by two gunshots. Later, Morris heard a woman screaming or crying for help. Morris estimated about 30 to 40 minutes elapsed between hearing the woman scream "no" and calling 911.[2]

Earlier that evening, Murk received a 911 call from a woman at 12:22 a.m., who claimed to have heard gunfire near Scidmore Park. Officer Jeremiah Wolters and Sergeant Karl Huhnke of the Three Rivers Police Department responded and searched the area, finding nothing. When these same officers returned to the same area after Morris's 1:26 a.m. 911 call, they found the victim lying face down in a puddle of blood behind a carport near Scidmore Park. The victim had been shot in the head with a small-caliber bullet. There was stippling near the wound, indicating the shooter held the gun extremely close to the victim's head. Although the officers noted blood in the immediate area, there were no blood trails or droplets indicating that the victim changed locations after being shot.

When the police found the victim, she was confused and scared, but coherent and communicative. The victim identified defendant as the shooter. Later that same morning, while the victim was in a hospital's intensive care unit (ICU), she spoke with Three Rivers Police Department Sergeant Sam Smallcombe and again identified defendant as the shooter.

Doctor Sarah Charters, a trauma surgeon at the hospital, testified that, on the morning of the shooting, the victim seemed entirely normal in terms of thinking, speaking, remembering, and processing. Dr. Charters observed that the victim showed no signs of cognitive deficiencies. Instead, the victim spoke clearly and coherently, and her account was consistent with the medical findings. Dr. Charters described that the bullet fragments penetrated the parietal lobe of the victim's brain.[3] The parietal lobe processes bodily sensations, and, in the victim's case, the bullet fragments caused paralysis in her legs and weakness in her left arm. When the victim arrived at the hospital, she was assessed at a 15 on the Glasgow Coma Scale, meaning that she was "talking and functioning normally" and that her brain was "processing information at a normal level." The hospital initially monitored the victim's cognitive function hourly and then with decreased frequency; however, the victim never deviated from that level during her stay.

---

[2] Morris told the police it was only 20 to 30 minutes before he called 911.

[3] The doctor assumed that the victim was shot once because there was one entry wound. The bullet and its fragments were not removed.

The following day, the police searched defendant's apartment.[4] They found a 50-count box of .22-caliber ammunition, containing 19 bullets, and .9-millimeter ammunition. The police never located a weapon, which the victim described as being "a small revolver."[5]

At trial, defense counsel vigorously contested the victim's testimony that defendant was the shooter. During opening statement, counsel alleged that the victim could not reliably identify the shooter because she was suffering from confabulation—a condition that makes it difficult to recall what happened during a traumatic event. Defense counsel also alleged that the victim received a death threat from someone other than defendant on the night before the shooting, inferring that this other person may have shot the victim. But counsel did not present evidence at trial to support either of these arguments. Instead, counsel presented an alibi defense.[6] More specifically, counsel called a witness who testified that defendant left his apartment at 12:19 a.m., just minutes before gunshots were heard and reported to 911 at 12:22 a.m. Given the distance between the locations, it would have been impossible for defendant to have been the shooter.

After the jury convicted defendant as charged, he appealed and filed a motion for a new trial and a *Ginther*[7] hearing. In particular, defendant claimed that he was denied the effective assistance of counsel because his attorney did not present an expert witness to support the confabulation theory, filed a motion concerning exhibits that he had not reviewed, and failed to support his claim that someone other than defendant sent the victim a death threat on the night of the shooting. Following a *Ginther* hearing, the trial court determined that as to certain matters counsel proceeded as defendant directed, and that, even if counsel had performed deficiently, defendant was not prejudiced.

Thereafter, defendant proceeded with his appeal, including filing a Standard-4 brief.[8] However, before this Court heard oral argument on defendant's appeal, defendant filed a motion to remand requesting an evidentiary hearing regarding newly discovered evidence, namely, a statement made by Kaitlyn Beauchamp, Swinehart's roommate from August 2021 until the end of 2021. Beauchamp stated that she heard Swinehart admit that she shot the victim. Attached to the motion was Beauchamp's affidavit, reflecting that she heard Swinehart say that Swinehart should get "half a teardrop tattoo" because she shot the victim. Beauchamp also stated that Swinehart specifically said that she shot the victim and defendant did not. This Court granted defendant's motion for remand and instructed the trial court to hold an evidentiary hearing to determine whether defendant was entitled to a new trial on the basis of newly discovered evidence. *People*

---

[4] The police were told the apartment belonged to defendant's girlfriend, but he lived there.

[5] Shortly after the shooting, another officer returned to the area with a metal detector and located a striated object that was more luminescent on one side. Although a photograph of the area where the object was found was admitted, the object itself was not admitted and the officer was not permitted to opine that it was a bullet fragment because he was not qualified to do so. No shell casings were found, indicating that a revolver was used.

[6] Counsel also challenged the thoroughness of the police investigation given its focus on defendant.

[7] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[8] Supreme Court Administrative Order No. 2004-6.

*v Parker*, unpublished order of the Court of Appeals, entered March 18, 2024 (Docket No. 358231).

At the evidentiary hearing, Beauchamp testified that Swinehart admitted to perpetrating the attack against the victim after defendant's trial concluded. However, Swinehart was intoxicated every time she talked about the incident and she never provided any details about it so Beauchamp could not discern whether Swinehart was telling the truth.

At the hearing, Swinehart testified that she told 5 to 10 people that she perpetrated the attack against the victim because she loved defendant and wanted to protect his reputation. But, Swinehart also testified that she did not shoot the victim. In fact, Swinehart was in Lawton with her aunt and uncle when the shooting occurred. Detective Smallcombe corroborated Swinehart's alibi.

After the hearing, the trial court determined that the evidence was noncumulative, but it also concluded that the evidence was not newly discovered because, had defendant been in the apartment all night as he told the police he was, he would have been able to testify at trial that Swinehart was absent from the apartment during the time of the shooting. The trial court also held that the evidence would not have made a different result probable on retrial. In support of this conclusion, the trial court noted that Swinehart never provided details about the incident when she told people "she did it" and Beauchamp was unsure whether she believed Swinehart was telling the truth. The trial court also based its conclusion on its finding that Swinehart told the truth at the evidentiary hearing. Based on the foregoing, the trial court entered a written order denying defendant's motion for a new trial. At that point, the case was resubmitted for decision.

## II. DISCUSSION

### A. PROSECUTORIAL MISCONDUCT[9]

#### 1. ISSUE PRESERVATION AND STANDARD OF REVIEW

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Defense counsel failed to object to the prosecutor's closing argument at trial, the victim testifying at trial, and the use of the victim's statements identifying defendant as the shooter. Therefore, these issues are not preserved. "Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *People v Clark*, 330 Mich App 392, 432; 948 NW2d 604 (2019). To establish plain error, a defendant must show that "1) an error occurred, 2) the error was plain, i.e., clear or obvious, and 3) the plain error affected his substantial rights, meaning it affected the outcome of the proceedings." *People v Jarrell*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 356070); slip op at 8-9.

---

[9] This Court has explained that a fairer label for most claims of prosecutorial misconduct is "prosecutorial error," because only the most extreme cases rise to the level of "prosecutorial misconduct." *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). To the extent we use the phrase "prosecutorial misconduct," it is as a term of art.

"Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Bennett*, 290 Mich App at 475.

## 2. ANALYSIS

"A prosecutor may not vouch for the credibility of a witness by conveying to the jury that he has some special knowledge that the witness is testifying truthfully. The prosecutor may, however, argue from the facts that a witness is worthy of belief." *Clark*, 330 Mich App at 434 (citations omitted); see also *Bennett*, 290 Mich App at 478 ("The prosecutor is free to argue from the evidence and its reasonable inferences in support of a witness's credibility.") (citation omitted). "[A] prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Jackson*, 313 Mich App 409, 426; 884 NW2d 297 (2015) (citation omitted).

During closing argument, the prosecutor stated:

What's the motive for this young lady to fabricate, to lie? There's no basis in the evidence that she's fantasizing, that it's the last thing she remembers so it must have been him.

By making the foregoing statement, the prosecutor neither vouched for the victim's credibility nor conveyed that he had special knowledge about her truthfulness. Rather, the prosecutor simply emphasized that the evidence did not support a claim that the victim fantasized defendant's role in the shooting and appropriately asked the jurors to question whether she had a motive to lie. This was appropriate because a major defense strategy throughout trial had been to discredit the victim's testimony. See *id*. ("[A] prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes."). Indeed, a key question at trial was whether the victim's identification of defendant as the shooter was believable. Consequently, the prosecutor did not commit misconduct by arguing that the victim had no motive to lie or tendency to fabricate.

In his Standard 4 brief, defendant also argues that the prosecutor erred by allowing the victim to be a complainant because she was not cognizant at the time the police obtained her impaired statement identifying him as the shooter. Defendant further asserts that the victim's identification of him as the shooter was the product of police coercion. These arguments are without merit because testimony from the police officers who found the victim and the medical professional who treated her showed that she was coherent and thinking clearly when she independently identified defendant as her shooter. Further, defendant offers no evidence in support of his theory that the police coerced the victim into identifying him as the shooter. Accordingly, we reject these arguments.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

### 1. ISSUE PRESERVATION AND STANDARD OF REVIEW

"[A] defendant must move in the trial court for a new trial or an evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). A defendant can also preserve a claim of ineffective assistance of counsel by filing a motion in this Court for a remand to the trial court for a *Ginther* hearing. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). In the circuit court, defendant filed a motion for a new trial and a *Ginther* hearing that alleged trial counsel was deficient for mentioning the confabulation theory in opening statement and not presenting an expert to support it, and for mentioning other threats made against the victim without presenting them at trial. These two issues are preserved. However, the other allegations of counsel's deficient performance were not preserved because they were not part of defendant's motion for a new trial or a *Ginther* hearing.

"A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021) (quotation marks and citation omitted). "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id*. Clear error exists where the reviewing court is left with a "definite and firm conviction" that the lower court made a mistake. *Id*. Defendant's unpreserved ineffective assistance of counsel claims are reviewed for errors apparent on the record. *People v Rosa*, 322 Mich App 726, 741 n 8; 913 NW2d 392 (2018).

### 2. ANALYSIS

A criminal defendant's right to a fair trial includes the right to effective assistance of counsel. *Isrow*, 339 Mich App at 531. "Trial counsel is ineffective when counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. (quotation marks and citation omitted). "Trial counsel's performance is presumed to be effective, and defendant has the heavy burden of proving otherwise." *Id*. "In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "If counsel's strategy is reasonable, then his or her performance was not deficient." *Isrow*, 339 Mich App at 532 (citation omitted).

#### a. FAILURE TO CALL AN EXPERT WITNESS

"[T]he failure to call a particular witness at trial is presumed to be a matter of trial strategy, and an appellate court does not substitute its judgment for that of counsel in matters of trial strategy." *People v Seals*, 285 Mich App 1, 21; 776 NW2d 314 (2009). A reviewing court must determine "whether the strategic choices [were] made after less than complete investigation, and any choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. Counsel always retains the duty to make reasonable investigations or

to make a reasonable decision that makes particular investigations unnecessary." *Trakhtenberg*, 493 Mich at 52 (quotation marks and citations omitted).

At the *Ginther* hearing, defense counsel testified that he interviewed multiple healthcare professionals to determine whether he could advance the theory that the victim was suffering from confabulation. Counsel, who was appointed about three months before trial, explained to defendant that an adjournment would be necessary to select and request funding for a potential expert witness; however, defendant eschewed an adjournment, expressing his desire to proceed with trial. Consequently, it was defendant's decision not to pursue calling an expert witness.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. [*Strickland v Washington*, 466 US 668, 691; 104 S Ct 2052; 80 L Ed 2d 674 (1984).]

Counsel's documented deference to defendant's decision to seek a speedy trial and not delay trial to attempt to locate a potential expert witness was a reasonable trial strategy.[10] See *Isrow*, 339 Mich App at 532 ("If counsel's strategy is reasonable, then his or her performance was not deficient.") (citation omitted). Notably, during the *Ginther* hearing, defendant never presented testimony from an expert that the victim may have suffered from confabulation.

Even so, counsel's reference to the confabulation theory during opening statement constituted deficient performance because counsel was not permitted to pursue that theory without an expert witness. Referencing a potential defense theory that cannot be supported with expert testimony at trial falls below an objective standard of reasonableness. See *Trakhtenberg*, 493 Mich at 51 (an attorney's performance is deficient when it falls below an objective standard of reasonableness).

Though counsel's performance was deficient in this regard, it did not prejudice defendant. Counsel's reference to the confabulation theory allowed him to plant an idea in the jurors' minds that the victim might be suffering from confabulation without ever having to present a witness. And counsel effectively cross-examined the prosecution's witnesses, including the victim, probing for inconsistencies and evidence that suggested the victim had memory issues. In doing so, counsel advanced the general defense that the victim's memory was compromised without having to label her disorder. Finally, we conclude that the trial court did not clearly err in concluding that

---

[10] Defendant testified that "[f]or the most part[,] I didn't want an adjournment, but when it came to gathering information or evidence that would support a defense[,] I was okay with that." Defendant further testified that counsel made a statement to him that as to the confabulation theory, he did not locate anyone that could assist the defense, and, therefore, there was no need to adjourn. However, the trial court was free to credit defense counsel's contrary testimony.

counsel's reference to confabulation did not prejudice defendant given the compelling evidence presented against him.

## b. FAILURE TO PRESENT EVIDENCE OF THREATS

During opening statement, trial counsel also stated the victim received a death threat from someone other than defendant shortly before the shooting occurred. But counsel did not present this threat at trial because defendant did not want his girlfriend inculpated in the shooting.[11] As already discussed, an attorney's "actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 US at 691. Counsel's strategy of omitting the threat was reasonable because revealing that defendant's girlfriend threatened the victim may had led the jury to believe that the two conspired together against the victim based on their intimate relationship, especially when the threats were conveyed via defendant's Facebook. See *Isrow*, 339 Mich App at 532, quoting *People v Randolph*, 502 Mich 1, 12; 917 NW2d 249 (2018) (" 'If counsel's strategy is reasonable, then his or her performance was not deficient.' "). At a minimum, defense counsel's decision to omit evidence concerning the threat did not overcome the strong presumption that his performance was effective. *Isrow*, 339 Mich App at 531 ("Trial counsel's performance is presumed to be effective, and defendant has the heavy burden of proving otherwise."). Counsel's decision to tell the jury that the victim received a death threat from someone other than defendant, and then omit further reference of that threat, may have been a strategic decision to cast suspicion on an unknown perpetrator without having to reveal that individual was defendant's girlfriend, as defendant directed.[12] Regardless, the trial court did not clearly err in concluding that defendant was not prejudiced by counsel's failure to admit evidence of this threat given the strength of the evidence presented at trial.

## c. FAILURE TO PRODUCE EVIDENCE IN SUPPORT OF THE ALIBI DEFENSE

Defendant further argues that defense counsel's performance was deficient because he did not contact other witnesses to have them testify that they heard gunshots around 12:22 a.m. on April 9, 2020. At the *Ginther* hearing, counsel testified that he was aware of these witnesses and provided various reasons for not electing not to call them.[13]

---

[11] At the *Ginther* hearing, the threat was revealed to be a Facebook message from defendant's account and was from defendant's girlfriend. It stated: "Ha-ha, I'm going to kill y'all and that baby b****." Defendant's girlfriend was initially listed as an alibi witness for defendant, but she was never called at trial because they decided to remove her.

[12] Notably, the police investigated defendant's girlfriend and cleared her as a suspect in the victim's shooting because she had an alibi.

[13] As for the woman who made the 12:22 a.m. 911 call, she told defense counsel that she took medication before going to bed and did not even recall making that call. The police report provided with defendant's brief on appeal, which was not admitted into evidence, see MCR 7.210(A)(1), but was referenced in questioning trial counsel during the *Ginther* hearing, also reflects that this

At trial, no one contested that a woman made a 911 call at 12:22 a.m. on April 9, 2020, reporting gunfire in the area near Scidmore Park. A key issue at trial was whether the victim was shot around 12:22 a.m., or closer to 1:26 a.m. Given the undisputed existence and content of this call, declining to present potentially duplicative testimony that gunshots were heard at 12:22 a.m. was a strategic choice.[14] For this reason, defendant has failed to show that counsel's decision not to call additional witnesses was deficient. See *Seals*, 285 Mich App at 21 ("[T]he failure to call a particular witness at trial is presumed to be a matter of trial strategy, and an appellate court does not substitute its judgment for that of counsel in matters of trial strategy."). And, for the reasons detailed by the trial court, even if defense counsel's performance was deficient in this regard, defendant was not prejudiced.

### d. FAILURE TO OBJECT DURING CLOSING ARGUMENT

Because the prosecutor did not impermissibly vouch for the victim's credibility during closing argument, see Issue II. A. 2., counsel's failure to object to the prosecutor's remarks did not constitute deficient performance. See *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015) ("[C]ounsel is not ineffective for failing to raise meritless or futile objections.").

---

woman, who identified herself during the call, was interviewed on the day of the shooting. This woman denied ever calling 911, stating that she did not hear or see anything. In trial counsel's view, this witness would not have been a cooperative. Notably, during the woman's 911 call, she reported hearing two gunshots and several people running from the scene. The police did not know why she recanted.

This same police report reflects that there were also several other women who told police that they heard at least one gunshot. One woman heard "a noise that sounded like a gun going off" around midnight. There was "only one noise." A second woman reported hearing "three gunshots" "sometime between midnight and 12:30." But, after opening her window and looking out, she saw nothing. At around 1 to 1:30 a.m., this same woman heard someone yelling "[h]elp." The yelling for help occurred about every five minutes, but this woman could not determine where the person seeking assistance was. A third woman also reported hearing one gunshot "[a]t around midnight or shortly after[.]" Her boyfriend heard it as well.

According to the police report, all of these women lived in the same apartment building as Dakarie Morris, the trial witness, who heard a woman scream "no" followed by two gunshots. Morris called 911 at 1:26 a.m. after hearing cries for help.

In counsel's view, two women who claimed to have heard at least one shot, did not provide a specific time for when they heard it. Moreover, when counsel attempted to visit the women, he did not find anyone home.

[14] In his Standard-4 brief, defendant points to a police report that he says was written by an emergency medical technician, who indicated that the victim had been lying in the area where she was found for "quite a while." Defendant has not provided this Court with that report, and, because it is not part of the record below, we do not address his argument. MCR 7.210(A)(1).

### e. FAILURE TO PROPERLY PREPARE FOR TRIAL

In his Standard 4 brief, defendant contends that his counsel was "ineffective because he said so himself" and also hinted "at his own inexperience." In support of his claims, defendant cites to a discussion that occurred on the second day of trial.

On that day, counsel filed an objection to the prosecutor's proposed exhibits and an objection to not being provided with physical copies of the exhibits as opposed to having them provided via a server.[15] Defense counsel asserted that, if the actual object to be depicted was being admitted, he should have been given the opportunity to inspect it. Moreover, defense counsel had consulted with a person who had extensive experience with firearms and some of the items depicted in the prosecutor's photographic exhibits lacked relevance. Furthermore, defense counsel was skeptical that the endorsed witnesses would be able to lay the appropriate foundation for their admission. Defense counsel identified these items as "an old rusty 22 hand gun" and a round-shaped item a police officer, using a metal detector, found in the area of the shooting.

Believing that all pretrial issues had been resolved, the court noted that the exhibits were sent to counsel the previous week and that counsel failed to notify anyone that he could not access them. The prosecutor added that no evidence regarding the gun would be admitted as the gun was found before the shooting in this case. Moreover, the prosecutor represented that his office staff assisted defense counsel's secretary in viewing the exhibits the week prior after defense counsel's secretary called and explained their inability to access the exhibits.

Given the prosecutor's representations, the court ruled that the defense's concerns about the gun being admitted were unfounded and that it would determine whether the officer who located what purported to be a bullet fragment would be able to lay the foundation for its admission. The court also later explained that the parties had met in chambers the previous Thursday and the prosecutor informed counsel that the gun would not be used and showed him each picture he intended to admit as an exhibit.

Thereafter, the prosecutor raised a concern that defendant was attempting to set up an ineffective assistance of counsel claim based on a jail call defendant made to John Peyton, III, a convicted felon. During defendant's conversation with Peyton, Peyton claimed that he and defense counsel were talking about defendant's case, adding "run the trial[;] they'll f*** it up[.]" The prosecutor expressed concern that in light of defense counsel's opening statement that "we are getting set up for [an] appeal on ineffective assistance of counsel." The prosecutor "strongly encourage[d] the Court to remove" defense counsel, whom he did not "believe [was] qualified to do a capital case" and to appoint a more senior attorney to handle the case.

Defendant himself then interjected that the prosecutor was misinterpreting his conversation with Peyton and defendant denied that he was "trying to set anybody up for anything." To the

---

[15] MCR 6.201(A)(6) provides that "a party upon request must provide all other parties: . . . a description of and an opportunity to inspect any tangible physical evidence that the party may introduce at trial, including any document, photograph, or other paper, with copies to be provided on request."

contrary, Peyton was being "very blunt," and sharing his belief that the prosecutor was the "inexperienced" one.

The court cautioned defendant regarding Peyton's involvement and suggested that defendant inquire about how many times Peyton, who had tried to represent himself, albeit unsuccessfully, had been convicted before listening to Peyton's advice. The court then asked whether defendant was comfortable proceeding with defense counsel or would waive any claim of ineffective assistance in light of the matters placed on the record. Defendant responded: "I trust him." The court replied that that was "fine," and, again, inquired whether defendant was waiving the issues placed on the record. Defendant replied that he did not want "to waive anything."

Defense counsel then asked to respond and stated that he was attempting to represent defendant "aggressively and ethically[.]" He noted that he had been an attorney for 25 years and challenged the prosecutor's criticisms, noting that he had been accused of ineffective assistance of counsel previously in another county, a claim that he viewed as meritless, and opined that that experience had tainted the prosecutor's view of him. Counsel further noted that he had tried capital matters previously.

The court chastised defense counsel, noting that his actions were not reflective of 25 years of experience. They included not reviewing the exhibits until the second day of trial,[16] not preparing for trial, forgetting and misstating things discussed a week earlier, and misstating things that were discussed in the court's presence.

Eventually, the court returned to ruling on defense counsel's motion. It determined that the exhibits were provided, and, outside of the gun, which was not being admitted, it would rule on their admissibility at the appropriate time.

The next day, the court apologized to defense counsel for losing its temper. The court then determined that defense counsel's motion was "well-made" as to the gun and the object that the officer found with the metal detector, noting that it had determined that the witness could not testify that the object was a bullet fragment.[17] The court described defense counsel's objections during trial as "complete," noting that it had ruled in the defense's favor on several occasions. The court also noted that defense counsel had the exhibits and added that counsel asked "some very good questions" of the doctor regarding the victim's cognitive behavior. The court added that it recognized that defense counsel wanted to consult with a neuro-psychologist, but defendant did not want an adjournment and "wanted to go to trial." The court commented that counsel "did a good job throughout the day in terms of preparation and trial and everything else."

Nowhere in these discussions did defense counsel state that he was ineffective or hint that he was inexperienced. To the contrary, defense counsel mentioned his 25 years of experience and maintained that he was representing defendant aggressively. Turning to the issues raised in

---

[16] This point was challenged by the prosecutor, and, notably, the court indicated that the prosecutor had shown the photographs to defense counsel.

[17] The object was not admitted into evidence, but a photograph of it was.

-11-

defense counsel's trial motion, the gun was not admitted, counsel succeeded in preventing an officer from opining that the object found at the crime scene was a bullet fragment, and defense counsel was able to view the exhibits before they were admitted. As the trial court recognized, counsel's motion was appropriate. Thus, defendant's unpreserved claim of ineffective assistance of counsel fails because he has not established that counsel's performance was deficient and that he was prejudiced.

### f. FAILURE TO CROSS-EXAMINE AND IMPEACH A KEY WITNESS

In his Standard-4 brief, defendant also asserts that trial counsel was ineffective for failing to properly cross-examine and impeach a key witness without identifying the witness or describing exactly how counsel's performance was deficient. Without this basic information, we are unable to properly review his claim, and this issue is both abandoned and doomed to failure because defendant has not established the factual predicate underlying his claim of ineffective assistance of counsel. See *People v King*, 297 Mich App 465, 474; 824 NW2d 258 (2012) ("An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue."); see also *People v Solloway*, 316 Mich App 174, 189; 891 NW2d 255 (2016) (a defendant has the burden of establishing the factual predicate underlying a claim of ineffective assistance of counsel). *Id.* And, in any event, the law is well settled that counsel's decisions concerning the cross-examination and impeachment of witnesses are matters of trial strategy. See *People v McFadden*, 159 Mich App 796, 800; 407 NW2d 78 (1987). The record in this case demonstrates that counsel thoroughly cross-examined the prosecution's witnesses and impeached their testimony on several occasions. Consequently, it does not appear that defendant could overcome the strong presumption that counsel's performance was effective. See *Trakhtenberg*, 493 Mich at 52 (citation omitted) ("In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy."). For all of these reasons, defendant is not entitled to relief on this issue.

### C. JUROR MISCONDUCT

Defendant contends that one of the jurors at trial committed misconduct by misrepresenting his knowledge of Dakarie Morris. Again, defendant fails to cite to the record or to any legal authority; therefore, he has abandoned this claim. *King*, 297 Mich App at 474. Even if he had not, the record does not support his claim. During voir dire, the trial court asked if any of the prospective jurors knew Morris and no one said that they did. One juror, however, candidly said that he knew Logan Biggs, another witness, from attending high school with him. The juror said that his prior knowledge of Biggs would not have any bearing on his impartiality. It is this juror that defendant now alleges failed to admit that he knew Morris. But, as already explained, defendant offers nothing to establish that this juror actually knew Morris. And, in any event, "[a]n allegation of juror misconduct, even if the alleged misconduct did actually occur, will not warrant a new trial unless the party seeking the new trial can show that the misconduct was such as to affect the impartiality of the jury or disqualify them from exercising the powers of reason and judgment." *People v Dunigan*, 299 Mich App 579, 586; 831 NW2d 243 (2013) (quotation marks and citation omitted). Because defendant has not made this showing, he is not entitled to relief for this reason as well.

## D.  LACK OF SUBJECT-MATTER JURISDICTION

Defendant further argues that the trial court lacked subject-matter jurisdiction, citing to *State v Chatmon*, 234 Kan 197; 671 P2d 531 (1983).  Defendant fails to explain why *Chatmon* applies, and, thus, this issue is abandoned.  See *King*, 297 Mich App at 474 ("An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue.")  Regardless, having reviewed *Chatmon*, we conclude that it is not binding on this Court, *People v Bell*, 276 Mich App 342, 349; 741 NW2d 57 (2007), and that it is readily distinguishable because it addressed a criminal defendant's conviction for an uncharged crime.  *Chatmon*, 234 Kan at 204.  Moreover, the Michigan circuit court unquestionably had subject-matter jurisdiction over the charged felonies after defendant was bound over for trial.  See *People v Lown*, 488 Mich 242, 268; 794 NW2d 9 (2011) ("Michigan circuit courts are courts of general jurisdiction and unquestionably have jurisdiction over felony cases.").

## E.  DUE PROCESS VIOLATIONS

Defendant asserts that his due process rights were violated because the police suppressed a tip that indicated he was not the shooter, depriving him of a potential defense.  Once again, defendant provides no factual support for this claim and it is abandoned.  *King*, 297 Mich App at 474.  In fact, Sergeant Smallcombe directly contradicted defendant's assertion when he testified that the Three Rivers Police Department did not receive any tips from the public suggesting that someone other than defendant was the shooter.

Defendant next claims that his due process rights were violated because the police and jail personnel coerced him into signing a bond agreement without counsel on a weekend morning when court was not in session due to COVID.  Yet again, defendant fails to provide any factual support for this contention or cite to any legal authority holding that he was entitled to have an attorney present when he signed this bond agreement.[18]  Therefore, this issue is abandoned.  *Id*.

## F.  VICTIM'S STATEMENT IMPROPERLY ADMITTED

In an argument that defendant frames as "Fruit of a Poisonous Tree," he contends that the prosecutor's use of the victim's ICU statement about the shooting was impermissible because the prosecutor and police helped the victim recall the events of the shooting.  This argument is abandoned because defendant offers no factual proof in support of it.  *Id*.  Regardless, testimony from the police officers who found the victim and the medical professional who treated her confirmed that the victim was coherent and thinking clearly when she independently identified defendant as her shooter at the scene of the shooting and in the ICU.  Nothing in the record suggests the prosecutor or police assisted the victim in constructing a fabricated version of the shooting.  And, even if the ICU statements were inadmissible, the victim's initial identification is

---

[18] The record contains no bond agreement signed by defendant.  The record reflects that a magistrate initially set defendant's bond at $1,000,000 cash or surety, which was later reduced to $500,000 cash or surety; however, defendant never posted bond.

unchallenged and defendant is not entitled to relief under the plain-error standard. See *Jarrell*, ___ Mich App at ___; slip op at 8-9; *Bennett*, 290 Mich App at 475.

## G. INSUFFICIENT EVIDENCE

Defendant contends that the evidence presented was insufficient to support his convictions, simply writing "insufficiency of evidence." Even if this unexplained argument was not abandoned, *King*, 297 Mich App at 474, it lacks merit.

The elements of AWIM are an assault with the actual intent to kill, which, if successful would make the killing murder. *People v Ericksen*, 288 Mich App 192; 793 NW2d 120 (2010). The elements of felony-firearm are carrying or having possession of a firearm when one commits or attempts to commit a felony. MCL 750.227b(1). "[I]t is [also] well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). "Identity may be shown by either direct testimony or circumstantial evidence which gives the jury an abiding conviction to a moral certainty that the accused was the perpetrator of the offense." *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967).

This Court reviews de novo challenges to the sufficiency of the evidence. *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). "Direct and circumstantial evidence, including reasonable inferences arising from the use of circumstantial evidence, may provide sufficient proof to meet the elements of a crime." *People v Bailey*, 330 Mich App 41, 46; 944 NW2d 370 (2019). Appellate courts also draw reasonable inferences and assesses witness credibility in favor of the jury's verdict. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Likewise, "[t]he credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000).

At trial, defendant did not contest that someone attempted to murder the victim using a firearm to shoot her in the head. Instead, defendant challenged the victim's identification of him as her shooter and presented an alibi defense.

Viewed in the light most favorable to the prosecution, the evidence presented at trial was sufficient to allow a rational trier of fact to determine that defendant was the shooter. Biggs's testimony corroborated the victim's testimony that she left Biggs's home before the shooting to meet defendant at the park, as defendant had suggested. Once there, the pair conversed and defendant donned gloves. When the conversation deteriorated, the victim began to walk back to Biggs's home as defendant followed her. After the victim reached the area behind a carport, she screamed "no." Defendant nevertheless shot her in the head with a small-caliber revolver[19] while

---

[19] The next day, the police found an open box of .22-caliber bullets in defendant's apartment. This small caliber bullet was capable of inflicting the injuries the victim suffered.

-14-

she was on her knees. Defendant then left the area while the victim waited for several minutes before calling for help.

At trial, the victim testified that defendant shot her. And, despite being shot in the head, the victim was coherent and spoke clearly when she identified defendant as the shooter at the scene of the crime and in the hospital. The jury credited the victim's testimony. This Court must draw reasonable inferences and assesses witness credibility in favor of the jury's verdict, *Nowack*, 462 Mich at 400, and we will not resolve anew the credibility of her identification testimony. *Davis*, 241 Mich App at 700.

With respect to defendant's alibi, it was undisputed that Murk received two 911 calls about shots being heard on the day and in the area that the victim was shot. One call was made at 12:22 a.m.; the other, at 1:26 a.m. During Michigan's COVID-pandemic lockdown, the victim left Biggs's apartment between 11:30 p.m. and midnight to meet defendant at the park as he had requested. Defendant's neighbor testified that she saw defendant leaving his apartment at 12:19 a.m. on Thursday, April 9, 2020, the day of the shooting. Because the police could not find a vehicle associated with defendant, it was assumed that he would have to walk to the park, a task that would require 10 to 15 minutes. Resultantly, if the shots reported at 12:22 a.m. involved the victim, defendant had an alibi because he could not have inflicted the victim's wounds a mere three minutes after leaving his apartment.

But the victim testified that defendant actually met her at the park and they discussed the pregnancy. If defendant arrived at the park at about 12:30 a.m., after exiting his apartment at 12:19 a.m., a rational trier of fact could have concluded that he had time to speak to the victim about her potential pregnancy, walk with her to the carport, and shoot her around 12:50 a.m. This timeline is also consistent with Morris's testimony that he heard a woman scream, "no," followed by two gunshots at around 12:46 a.m. or 12:56 a.m.—about 30 to 40 minutes before Morris called 911 at 1:26 a.m.

The 1:26 a.m. timeline is further supported by the fact that the police officers did not see the victim when they were initially dispatched in response to the first 911 call at 12:22 a.m. If the victim had been shot at that time, Officer Wolters should have discovered her because he checked the same area where she was later found. Officer Wolters testified that he easily saw the victim on ground after responding to Morris's 1:26 a.m. 911 call. Moreover, given the victim's paralysis and the blood concentrated in the area where she was found, the victim did not move far after being shot. Viewing all of this evidence in the light most favorable to the prosecution, a reasonable jury could conclude that the victim was shot before Morris's 1:26 a.m. 911 call and not at the time of the 12:22 a.m. 911 call, which provided defendant with an alibi. This same evidence was also sufficient to support defendant's AWIM and felony-firearm convictions and he is not entitled to relief on this claim.

## H. MOTION FOR A NEW TRIAL

### 1. ISSUE PRESERVATION AND STANDARD OF REVIEW

This issue was preserved by defendant's motion for new trial after this Court's remand, which the trial court denied. "This Court reviews for an abuse of discretion a trial court's decision

-15-

on a motion for a new trial." *People v Rogers*, 335 Mich App 172, 191; 966 NW2d 181 (2020). "A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable outcomes." *Id*.

## 2. ANALYSIS

A trial court may grant a new trial on the basis of newly discovered evidence if the defendant demonstrates that: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Johnson*, 502 Mich 541, 566; 918 NW2d 676 (2018) (quotation marks and citation omitted). Defendants bear "the burden of making the requisite showing regarding each of the four parts of the *Cress*[20] test." *People v Rao*, 491 Mich 271, 274; 815 NW2d 105 (2012).

The trial court made two errors when it ruled on defendant's motion for a new trial. First, the trial court concluded that the evidence was not newly discovered because, had defendant been in the apartment all night like he said he was, he would have been able to testify that Swinehart was absent from the apartment during the time of the shooting. It appears that the trial court considered the wrong evidence in making this finding. The evidence at issue during the evidentiary hearing was Beauchamp's testimony that Swinehart admitted to perpetrating the attack against the victim. Even if defendant knew Swinehart left the apartment on the night of the shooting, that does not mean that he knew Swinehart admitted to perpetrating the attack against the victim. Consequently, the trial court erred in reaching its determination that the Swinehart's admission did not constitute newly discovered evidence.

The trial court also erred in its analysis of the fourth *Cress* prong. In concluding that Beauchamp's testimony would not make a different result probable on retrial, the trial court noted that it believed Swinehart was telling the truth when she denied shooting the victim. However, the relevant inquiry was not whether the trial court believed Swinehart was telling the truth. Rather, the trial court needed to determine whether it was probable that a jury would reach a different result on retrial with the admission of Beauchamp's testimony. See *Johnson*, 502 Mich at 568 ("[I]f a witness is not patently incredible, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide, were it the ultimate fact-finder."). But, even though the trial court erred in its analysis, we affirm its order denying defendant's motion for a new trial because the it reached the correct result, albeit for the wrong reason. See *People v Hawkins*, 340 Mich App 155, 195; 985 NW2d 853 (2022) ("This Court will not reverse when a lower court reaches the right result for the wrong reason.").

The first prong of the *Cress* test mandates that the evidence must be newly discovered. *Johnson*, 502 Mich at 566. In *Rao*, our Supreme Court defined newly discovered evidence as evidence that was "unknown to the defendant or his counsel at the time of trial." *Rao*, 491 Mich at 283 (quotation marks and citation omitted). Under this standard, the evidence of Swinehart's

---

[20] *People v Cress*, 468 Mich 678; 664 NW2d 174 (2003).

admission was newly discovered because Beauchamp first heard Swinehart make the admissions after defendant's trial concluded and did not tell defendant about the admissions until 2023. While it is possible that Swinehart told other people that she perpetrated the attack against the victim before defendant's trial, there is nothing in the record indicating that defendant knew of them at the time of trial. Whether defendant could have testified at trial that Swinehart was not in the apartment when the shooting took place does not undermine defendant's post-trial discovery of Beauchamp's testimony that Swinehart admitted to perpetrating the attack. Therefore, under the definition of newly discovered evidence employed in *Rao*, Beauchamp's testimony constituted newly discovered evidence.

With respect to the second *Cress* prong, the evidence was noncumulative because no other evidence indicated that Swinehart admitted to the crime. Under the third *Cress* prong, it does not appear the evidence could have been discovered before trial because Beauchamp testified that Swinehart made the admissions after defendant's trial concluded and Swinehart could not recall when she first admitted to perpetrating the attack against the victim. Further, the police interviewed Swinehart before trial and nothing in the record indicates that she confessed to the crime during those interviews. Indeed, Detective Smallcombe interviewed Swinehart three times and gathered nothing that indicated she was the shooter.

The last inquiry is whether the testimony about Swinehart's admission would make a different result probable on retrial. In making that determination, this Court must first determine whether Beauchamp's testimony is credible, which involves determining whether a reasonable juror *could* find Beauchamp's testimony credible. *Johnson*, 502 Mich at 566-567. Note, the credibility of Swinehart's admission is not relevant to this inquiry because the evidence at issue is Beauchamp's testimony that she heard Swinehart make these admissions. Because Swinehart admitted that she told people she attacked the victim, a reasonable juror could find Beauchamp's testimony credible. Nevertheless, its introduction would not make a different result probable on retrial. The credibility of Swinehart's admission is crucial to resolving this inquiry. At the hearing, Swinehart testified that she lied when she told people she perpetrated the attack against the victim. Thus, Swinehart was either lying when she admitted to perpetrating the attack against the victim or when she testified that she lied about doing so during the hearing.

Swinehart's proffered motive for lying is relevant in determining the credibility of her denial. Swinehart testified that she lied to protect defendant and his reputation because she loved him. The record demonstrates that Swinehart lived with defendant and they were in a romantic relationship at the time of the shooting. Defendant's trial counsel and Officer Holbrook also testified that defendant and Swinehart were involved in a romantic relationship at the time of the shooting. During trial, defendant would not let his attorney present the threatening texts Swinehart sent to the victim because he did not want to incriminate her in the shooting. The fact that Swinehart and defendant were engaged in a romantic relationship at the time of the shooting corroborates Swinehart's testimony that she lied because she loved defendant and wanted to protect his reputation.

While a reasonable person might not lie and say they committed a felony to protect someone else's reputation, Swinehart was not in a reasonable state of mind when she made these statements. In fact, Beauchamp testified that Swinehart was always intoxicated when she made these admissions. And Swinehart testified that she was distressed when she made these statements

-17-

because she was pregnant with defendant's child and she was angry that he had "ripped his family" apart.

It is also important to recognize that Beauchamp was unsure about whether Swinehart was telling the truth when she suggested she shot the victim. In addition to Swinehart's intoxication, Beauchamp recognized that Swinehart never provided additional detail. And, at the evidentiary hearing, Swinehart was unable to provide details about what happened to the victim.

Further, there was evidence that Swinehart did not shoot the victim because she was in Lawton during the shooting. At the hearing, Swinehart testified that she was with her aunt and uncle in Lawton on the night of the shooting and that she returned the following morning an hour before the police arrested defendant. Detective Smallcombe corroborated Swinehart's testimony, testifying that he observed Swinehart return to defendant's apartment on the morning after the shooting roughly an hour before the police arrested defendant. Detective Smallcombe also learned that the man driving the truck Swinehart returned in was her uncle who lived in Lawton. This evidence supports the conclusion that Swinehart was in Lawton without her own transportation on the night of the shooting. It also corroborates Swinehart's testimony that she was picked up by her aunt and uncle on the night of the shooting and taken to Lawton.[21] Importantly, at trial, Detective Smallcombe testified that he was able to rule out Swinehart as a suspect because she had an alibi placing her elsewhere at the time of the shooting. The police had spoken to Swineheart's aunt, who informed them that she had taken Swineheart to Lawton so Swineheart was not in Three Rivers the night of the shooting.[22]

Moreover, this Court is required to consider the testimony that would be introduced on retrial. *Id*. at 571. Assuming the defense strategy at retrial would be to show Swinehart was the shooter, it is likely the prosecution would call Andrew Keith as a witness. In his interview with Wolters, Keith stated that he was with defendant on the day of the shooting from about 6:30 p.m. to 7:17 p.m. Defendant told Keith that he had a fight with Swinehart. At retrial, Keith's testimony would corroborate Swinehart's statement that she left and went to Lawton because she fought with defendant. Further, Keith stated that defendant "drank a pint" and said he was going to meet up with Swinehart after he left around 7:15 p.m. Swinehart testified that defendant kicked her out of

---

[21] We note that Lawton is approximately 25 miles from Three Rivers, a drive of approximately one-half hour by automobile. <https://www.google.com/maps/dir/Three+Rivers,+Michigan+49093/Lawton,+Michigan+49065/@42.055604,-86.0719116,10z/am=t/data=!4m13!4m12!1m5!1m1!1s0x88170710d6c52557:0x25fbd85923e44ab0!2m2!1d-85.632493!2d41.9439368!1m5!1m1!1s0x88176ca924c4e70b:0xabb4d173a84c4bca!2m2!1d-85.8469539!2d42.1672629?entry=ttu&g_ep=EgoyMDI0MTEwNi4wIKXMDSoASAFQAw%3D%3D> (last accessed December 11, 2024).

[22] Swineheart's aunt was subpoenaed to testify at the evidentiary hearing, but she was not called as a witness. The court did not accept Detective Smallcombe's report of what Swineheart's aunt had purportedly said for the truth of the matter asserted; instead, the court considered the aunt's statements to show what actions Detective Smallcombe took to investigate the shooting.

the apartment around 7:00 p.m. Thus, Keith's statement corroborates Swinehart's testimony about the time she left and explains why defendant might have kicked Swinehart out of his apartment—he was under the influence of alcohol and they were fighting.

It is also likely that the prosecution would call Swinehart's aunt as a witness at trial. She would testify that she took Swinehart to Lawton on the night of the shooting, corroborating Swinehart's testimony that she was in Lawton on the night of the shooting.

The threatening texts Swinehart sent to the victim would also likely be admitted at retrial. However, it is unlikely that the introduction of the texts along with Swinehart's admission would make a different result probable on retrial because, as discussed earlier, the evidence indicates that Swinehart was in Lawton when she sent those texts and for the duration of the night. Importantly, Detective Smallcombe knew Swinehart sent those texts when he testified that he ruled out Swinehart as a suspect because she had an alibi.

In addition to the unreliability of Swinehart's admission and the evidence demonstrating that she was not in Three Rivers around the time of the shooting, the victim's testimony shows that defendant was the shooter. The victim testified that she met defendant in Scidmore Park on the night of the shooting to discuss her potential pregnancy. Defendant chose the location. Biggs corroborated the victim's testimony that the victim left his house to go to Scidmore Park between 11:30 p.m. and midnight to meet the man she thought impregnated her to discuss the situation. Shasta Kunz confirmed that defendant left his apartment around 12:19 a.m. on the night of the shooting. This placed defendant and the victim in a secluded area around the time the shooting likely occurred. The meeting spot is near the location where the victim was shot. When interviewed by the police, defendant initially said that he never left his apartment on the night of the shooting. At trial, however, the defense called Kunz to testify at trial that she saw him leave the apartment building at 12:19 a.m. on that night. Defendant's lie to the police is circumstantial evidence of his guilt. *People v Dandron*, 70 Mich App 439, 443-445; 245 NW2d 782 (1976) (a false exculpatory statement may be considered circumstantial evidence of an accused's guilt).

The victim was able to provide very specific details about her interaction with defendant leading up to the shooting. The victim recounted how the pair sat on a bench in Scidmore Park. Although defendant was calm near the beginning of their discussion, he became angry as it continued. The victim also remembered that defendant put on gloves during their conversation and that he appeared abnormally stiff as he walked the victim toward the carport. At preliminary examination, the victim testified that defendant attempted to have her walk the trails in areas of Scidmore Park that were enclosed by trees, but she refused because she was afraid of what he might do. The foregoing suggests that defendant was preparing to shoot the victim before pulling out the gun and attempting to guide her into an area where it would be unlikely for anyone to hear gunshots or find the victim quickly.

Critically, the victim saw defendant pull out a gun before he shot her and watched him as he shot her. The victim even remembered begging defendant not to shoot her before he pulled the trigger, demonstrating that she saw him with the gun before he shot twice. Morris, an independent witness, corroborated the victim's testimony on this point when he testified that he heard a woman scream, "No," before hearing two shots fired. The victim further testified that she called for help after the shooting. Again, Morris confirmed that he heard a woman calling for help. In total,

Morris corroborated three specific elements of the victim's testimony about what happened just before, during, and shortly after the shooting. This strongly supports the victim's ability to accurately recount the timeframe and the identity of the shooter.

And, as already discussed, the victim identified defendant as the shooter multiple times within minutes and hours of the shooting. The victim was coherent and speaking clearly when she identified defendant as the shooter at the scene of the crime, in the hospital, and at trial. While a reasonable juror might question the accuracy of the victim's recollection of the shooting given the nature of her injury, every witness who encountered the victim after the shooting testified that her cognitive functions appeared to be unaffected. Most notably, Dr. Charters testified that the victim did not appear to suffer any cognitive damage from the shooting. Such evidence leaves little room for a reasonable juror to doubt the veracity of the victim's testimony.

The victim's identification of defendant as the shooter is a very strong factor indicating that Swinehart's admission would not make a different result probable on retrial. While there were no third-party eyewitnesses to the shooting, testimony offered by other witnesses corroborated multiple aspects of the victim's testimony. In turn, this enhanced the overall credibility and accuracy of the victim's testimony, including her identification of defendant as the shooter. And, finally, Detective Smallcombe testified that none of the leads the police received pointed to someone other than defendant as the culprit. Accordingly, combined with the evidence suggesting that Swinehart was lying when she took responsibility for shooting the victim and the evidence suggesting that defendant was the shooter, we conclude that the introduction of Swinehart's admissions to Beauchamp and others would not make a different result probable on retrial.

Affirmed.

/s/ Noah P. Hood
/s/ Thomas C. Cameron
/s/ Anica Letica